BASILE TZOVOLOS ET AL. *v.* SCOTT WISEMAN ET AL.

JASON ROBERT'S, INC. *v.* ALPERT REALTY, LLC*

Superior Court, Judicial District of New Haven
File Nos. CV-04-0488839 and CV-04-4020178

Memorandum filed May 3, 2007

* Affirmed. *Tzovolos* v. *Wiseman,* 300 Conn. 247, 12 A.3d 563 (2011).

*Richard W. Callahan,* for the plaintiffs in the first case.

*Shepro & Blake, LLC,* for the defendant Robert D. Hartmann, Sr., et al. in the first case and the plaintiff in the second case.

*Berdon, Young & Margolis, P.C.,* for the defendant Alpert Realty, LLC, in both cases.

COSGROVE, J. These cases evolve from the development of and opening of a restaurant Seawind, LLC, doing business as The Kitchen (Seawind) at 12 Selden Street in Woodbridge (Selden Street). In the first case, the plaintiffs, Basile Tzovolos and Olympia Tzovolos, sold kitchen equipment located at Selden Street to the defendants Scott Wiseman (Wiseman) and Seawind and perfected a purchase money security interest in the equipment. The plaintiffs seek payment for this kitchen equipment. The plaintiffs also bring additional claims against the defendants Robert Hartmann, Sr. (Hartmann, Sr.), Jason R. Hartmann, Robert Hartmann, Jr. (Hartmann, Jr.), Jason Robert's, Inc. (JRInc.), Jason Robert's Concrete, LLC (JRCLLC) and Alpert Realty, LLC (Alpert), relating to the purchase money security interest in the kitchen equipment. In total, there are eleven counts. JRCLLC has filed a counterclaim for conversion against the plaintiffs. Additionally, Alpert and JRCLLC have filed cross complaints and counterclaims against each other.

In the consolidated case, JRInc., based upon an asserted security interest in the kitchen equipment acquired by Seawind from the plaintiffs, seeks to recover from Alpert, the landlord of Selden Street, for Alpert's conduct in regards to the kitchen equipment. Three separate theories of recovery are asserted.

I

## PROCEDURAL HISTORY

On April 17, 2004, the plaintiffs commenced this action by way of an application for a prejudgment remedy against Wiseman and Seawind. The application sought to attach assets belonging to Wiseman and to secure certain kitchen equipment remaining at Selden Street. The plaintiffs had a purchase and sale agreement for commercial kitchen equipment with the defendants for the price of $35,000. The defendants paid for the equipment in part by a check for $10,000, and the balance of $25,000 was to be paid by means of a promissory note from Wiseman. The plaintiffs were given a security interest in the equipment to secure payment of the note. Although the purchase and sale agreement was signed by both Wiseman and Seawind, the bill of sale vested ownership solely in Wiseman and Wiseman alone signed the promissory note.

The prejudgment remedy application was accompanied by an application for an ex parte temporary restraining order. The application for the temporary restraining order identified an additional party, Hartmann, Sr., a principal of JRCLLC, who might claim an interest in the kitchen equipment. The temporary restraining order application was denied on April 14, 2004. The application for a prejudgment remedy, however, was granted after a hearing on May 17, 2004. The plaintiffs were given authority to attach Wiseman's personal property, up to the sum of $25,000, or to garnish Wiseman's bank accounts, up to the sum of $25,000. The court also ordered that the plaintiffs could "assume possession of the kitchen equipment located at . . . Selden Street . . . ."

The officer's return of service with regard to the application for the prejudgment remedy indicates that the individual defendant, Hartmann, Sr., was served on

April 24, 2004, and that the other defendants, Seawind and Wiseman, were also served on that date. Seawind was represented at the commencement of this action by the law firm of Shepro and Blake, LLC (Shepro).

The initial complaint was brought in six counts. The first three counts, against Wiseman and Seawind, asserted contractual claims, claims under a promissory note, and an equitable claim of unjust enrichment arising out of a sale of kitchen equipment in August, 2003. The fourth count alleged that Hartmann, Sr., Hartmann, Jr., Jason R. Hartmann and their corporate entity, JRCLLC, converted the kitchen equipment by removing it from Selden Street where it was located. The fifth count claimed that Hartmann, Sr., was a member of Seawind, and that at the time the kitchen equipment was removed from Selden Street, Seawind was insolvent as that term is defined under General Statutes § 52-552c, and, therefore, the removal of the equipment was a fraudulent transfer. The sixth count of the complaint alleged that the Hartmanns and their corporate entities, JRCLLC and JRInc., had committed unfair trade practices in violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. Subsequent to the granting of the prejudgment remedy and the service of the underlying complaint, Shepro entered an appearance on behalf of Hartmann, Sr., Hartmann, Jr., Jason R. Hartmann, JRCLLC and Seawind.

Wiseman was soon defaulted for his failure to appear and defend this action. On October 16, 2005, he filed a petition in bankruptcy. The pleadings were closed with the remaining defendants, and on December 17, 2004, the matter was claimed to the courtside trial list.

A motion was filed to disqualify Shepro from its representation of all of the defendants in this action. The court record is unclear whether that motion was ever acted on, but thirteen days before a scheduled trial date

in May of 2005, Shepro received permission to withdraw its appearance on behalf of Seawind. A new attorney has not subsequently entered an appearance on behalf of Seawind.

On January 13, 2006, the court entered a scheduling order in this matter to address the issue of the bankruptcy of Wiseman, a time frame for any amendment of the pleadings, a time table for written discovery, completion of depositions, and to set a trial date of May 18 and 19, 2006. In compliance with the court order, the plaintiffs filed a motion to amend their complaint to assert that they should be allowed to pierce the corporate veil of the defendant corporations, JRInc., Seawind and JRCLLC, so as to assert monetary claims directly against the individual Hartmann defendants.

During the pendency of this action, an entity controlled by the Hartmann defendants, JRInc., represented by Shepro, filed an action in the judicial district of Ansonia-Milford against the landlord in this action, Alpert. JRInc. sought damages against Alpert relating to Alpert's decision to allow the plaintiffs to inspect equipment that was subject to the alleged security interest. In the interests of judicial economy, and to avoid an inconsistent court ruling regarding the kitchen equipment, the JRInc. case was transferred to the New Haven judicial district and consolidated with the plaintiffs' case. The plaintiffs cited in JRInc. and Alpert as party defendants. The plaintiffs filed a revised complaint, adding four counts to their complaint. The complaint alleges first, in the alternative, that either JRInc. or Alpert had converted the equipment; second, that JRInc. and Alpert had tortiously interfered with the plaintiffs' contractual rights; third, that they had acted in violation of CUTPA; and fourth, a claim of unjust enrichment as to JRInc. and Alpert. The plaintiffs' complaint now contained eleven counts. Upon service of the complaint on JRInc., Shepro filed an appearance on behalf of

JRInc. in addition to the other defendants that it was currently representing.

In addition to a substantial number of pretrial discovery disputes, the defendants were found in contempt of court, *DeMayo, J.*, on March 20, 2006. Hartmann, Sr., refused to turn over certain kitchen equipment that he or his corporate entities had been holding in warehouses contrary to the prejudgment remedy order in this case. The contempt alleged that Hartmann, Sr., had demanded payment of $2400 in order to turn over kitchen equipment he had been storing on his property. The defendants have appealed the finding of contempt. The appeal was still pending during the trial of the consolidated cases.

On June 14, 2006, the defendants, who were represented by Shepro, filed a motion to modify a scheduling order that included commencement of trial on August 2, 2006, and that motion was granted by the court, *Lager, J.*, on July 6, 2006.

On August 2, 2006, the court, *Lager, J.*, issued a revised scheduling order and set a firm and final trial date of December 13, 2006. Further, the court ordered monthly status conferences in September, October and November to make sure that the case was moving toward trial.

On November 17, 2006, the court sent a notice to all parties entitled to final reassignment for trial. The trial date was continued from December 13 to December 19, 2006. The court further indicated that at that time it would not grant further continuance for this courtside trial and that "all parties and counsel must appear and proceed or risk entry of a nonsuit, dismissal or default." On December 19, 2006, at the commencement of trial, it was determined that the pleadings had not been closed. For the first time, the defendants, represented by Shepro, indicated a desire to have the case tried

before a jury. The court, *Lager, J.*, reviewed this demand for a jury trial and denied the same and assigned the case for immediate trial. On the first day of testimony, the court, *Cosgrove, J.*, ordered the parties to close the pleadings forthwith.

The defendant Alpert, in addition to answering the plaintiffs' complaint, filed a cross complaint against the individual Hartmann defendants and their corporate entities, but not against Seawind or Wiseman. The cross complaint alleged that the Hartmann defendants had entered into an indemnification agreement with Alpert to protect Alpert from any claims or losses arising out of Alpert's decision to allow those defendants access to Selden Street and to remove personal property. On that same day, the defendant JRCLLC filed a counterclaim against the plaintiffs for conversion of kitchen equipment. JRCLLC filed a counter cross claim against Alpert. The first count sounded in a claim of misrepresentation as to the security of the kitchen equipment located at Selden Street; the second count alleged that Alpert had converted the secured property to itself to the loss and damage of JRCLLC; and finally the third count alleged intentional misconduct on the part of Alpert. Appropriate responsive pleadings were filed.

The trial of this case commenced on December 19, 2006, and continued until January 9, 2007. Trial briefs were filed on January 23, 2007. During the course of the trial, the court heard testimony from Basile Tzovolos, Sr., Basile Tzovolos, Jr. (Billy), Michael Klein, Lina Alpert, Ona Alpert, Hartmann, Sr., Wiseman and Raymond Cruciani. Jason R. Hartmann and Hartmann, Jr., did not testify. The court further had for its consideration approximately 100 exhibits.

## II

### PRELIMINARY STATEMENT OF ISSUES

There are several basic issues that the court must resolve before addressing the issues raised by each

asserted theory of recovery or defense. The first issue involves the ownership of the kitchen equipment. Who was the owner of the kitchen equipment on August 18, 2003? Determination of that issue will allow the court to address the competing security interests of the plaintiffs and JRCLLC.

The second issue relates to control of Selden Street. As of April 14, 2004, the date the locks were changed, who had a right to control entry to the premises?

The third issue is whether any of the kitchen equipment was removed from the premises improperly and if so what was the value of the equipment?

Finally, the court must determine whether it is appropriate under the facts of this case to pierce the corporate veil so as to place individual liability on Hartmann, Sr., Jason R. Hartmann, and/or Hartmann, Jr., for the conduct of Seawind, JRInc. or JRCLLC. After resolving these issues, the court will in turn examine the individual theories of liability, defenses, cross claims, and counterclaims put forward by the parties.

## III

## FINDINGS OF FACT

The court makes the following findings of fact and will add additional findings as they become necessary to analyze the particular theories of liability or defenses asserted by the parties. In this discussion of the findings of fact, the court notes that Hartmann, Sr., and his attorneys frequently failed to distinguish between whether they were acting on behalf of JRInc., JRCLLC, Seawind and/or the individual Hartmann defendants. Sometimes they reference "Jason Roberts" without distinguishing between JRInc., JRCLLC and individuals.

For a long time prior to 2002, the plaintiffs operated the Mykonos Restaurant at Selden Street. The plaintiffs

leased the restaurant premises from Alpert. Billy worked with his parents in the restaurant, and because of his fluency in English, frequently represented his parents in their business dealings. In 2002, the plaintiffs decided to sell their restaurant business and equipment. In November of 2002, the plaintiffs and their corporation, Mykonos, Inc., doing business as Mykonos Restaurant & Pizza, entered into a purchase and sale agreement with Abderrahim Chaouki for the sale of the restaurant business, sale of the inventory and equipment, the right to use the trade name Mykonos Restaurant & Pizza, and a covenant not to compete. The contract price of $70,000 was paid in part by check and the balance by promissory note. With regard to the equipment, which was described in the contract, the seller retained "a purchase money security interest . . . until all payments have been made." The contract was further contingent upon Chaouki being able to negotiate a lease with Alpert. The lease was negotiated. The principals of Alpert are Lina Alpert and Ona Alpert.

Chaouki's business failed and he did not make the payments required under the promissory note to the plaintiffs. Chaouki and his business partners sued each other over the business. During the course of a hearing for a prejudgment remedy in the Chaouki litigation, Chaouki and his partner acknowledged the UCC-1 held by the plaintiffs, and each, through their lawyers, agreed on the record to provide access to the restaurant premises so that the plaintiffs could recover the equipment. The court noted to the attorney for the plaintiffs: "Why don't you take your clients and be thankful that you're out of here in short order, and you've got the assurance of both counsel that they're going to return the property to these gentlemen."

On March 7, 2002, Wiseman filed articles of organization for the domestic limited liability company, Seawind. Wiseman was identified as the sole manager or member.

On July 15, 2003, the plaintiffs entered into negotiations to resell the recovered kitchen equipment to Wiseman. An agreement with Wiseman and Seawind was reached. The agreement set a price of $35,000 for the restaurant equipment and provided that the seller would have a "purchase money security interest in the equipment transferred pursuant to this agreement until all payments have been made." The agreement required an initial payment of $10,000 and the balance was to be paid via a promissory note.

On August 19, 2003, Seawind endorsed a check for $10,000 to the sellers. The Seawind check was drawn on the account of Hartmann, Sr. The promissory note was executed only by Wiseman, not Seawind, and provided that it would "be secured by a purchase money mortgage on certain equipment itemized in Schedule A attached hereto and made a part hereof . . . ." The plaintiffs provided Wiseman, not Seawind, with a bill of sale for the restaurant equipment, and, subsequently, on August 21, 2003 at 8:30 a.m., filed a UCC-1 with the Office of the Secretary of the State.

On or about August 1, 2003, Wiseman, on behalf of Seawind, entered into a lease for Selden Street with Alpert. The lease provided: "[I]f the leased premises shall be deserted or vacated, the [l]andlord or its agents shall have the right to and may enter the said premises, either by force or otherwise . . . ." The lease also provided: "The [t]enant shall not make any material alterations, additions, or improvements to said premises without the prior written consent of the [l]andlord. All erections, alterations, additions and improvements, whether temporary or permanent in character, which may be made upon the premises either by the [l]andlord or the [t]enant, except furniture or movable trade fixtures installed at the expense of the [t]enant, shall be property of the [l]andlord and shall remain upon and be surrendered with the premises as a part thereof at

the termination of this lease, without compensation to the [t]enant."

On August 19, 2003, Alpert authorized Wiseman and Seawind to make certain renovations to Selden Street. The renovations were to be performed by JRInc. All of the renovations were to occur in the dining room area and the bathrooms of the premises, not the kitchen area.

Wiseman, while purchasing the kitchen equipment from the plaintiffs and securing a lease for the premises from Alpert, was also negotiating to obtain a business partner for his new restaurant venture. On August 19, 2003, Wiseman, as a member of Seawind, entered into an amended operating agreement for the LLC with Hartmann, Sr., Jason R. Hartmann and Hartmann, Jr. The principal office of Seawind was changed from Wiseman's address to the offices of Hartmann, Sr. The agreement contemplated the following capital contributions: Wiseman $40,000; Hartmann, Sr., $25,000; Jason R. Hartmann $1; and Hartmann, Jr., $1. Wiseman's capital contribution was to be the kitchen equipment he acquired from the plaintiffs. Wiseman and Hartmann, Sr., were designated as comanaging members. Wiseman was to manage the day-to-day operations of the restaurant and Hartmann, Sr., was designated the tax matters member. Section 7.2 (b) of the agreement provided that "[a]ny third party shall be entitled to rely on all actions of the [m]anaging [m]ember and shall be entitled to deal with the [m]anaging [m]ember as if it was the sole party in interest therein, both legally and beneficially." Section 8.4 of the agreement required that "[a]ny transactions between the [c]ompany and [m]embers or their [a]ffiliates not specified in this [a]greement shall require the approval of a majority vote of the [p]articipating [p]ercentage." The agreement also provided a detailed procedure for the winding up of the business of Seawind.

Hartmann, Sr., was experienced in restaurant renovations and hoped to use the renovation of the proposed restaurant at Selden Street to boost his other businesses. Hartmann, Sr., testified that prior to the signing of the operating agreement on August 19, 2003, and providing the $10,000 check utilized by Wiseman for the closing with the plaintiffs, he had never viewed the proposed restaurant site. Curiously, a day before the signing of the operating agreement with Seawind, one of Hartmann, Sr.'s corporate entities, JRInc., submitted proposals for the renovations at Selden Street. Hartmann, Sr., further claimed that he never reviewed the lease between Seawind and Alpert nor did he ever see the agreement with the plaintiffs prior to March of 2003.

JRInc. commenced renovations of the dining room and bathrooms of Selden Street shortly after August 18, 2003. Building permits were taken out identifying JRInc. as the "owner" or contractor. There was no contract between Seawind and JRInc. regarding the scope or cost of the renovations. Hartmann, Sr., anticipated that the initial renovations would cost $10,000 but the final bill presented was in excess of $100,000. A review of the records documenting these services depicts a confusing and contradictory collection of the invoices of JRInc. and JRCLLC. Some of these invoices are marked paid, some appear to be duplicative and some state conflicting dates. All of the invoices are directed to Seawind. The building renovations were completed in early December, 2003, and a certificate of occupancy was obtained. In December of 2003, Seawind, doing business as The Kitchen, opened to the public for business.

Seawind made monthly payments on Wiseman's note to the plaintiffs on September 9, 2003, and again on October 10, 2003. The restaurant did not flourish and cash flow was low. On January 26, 2004, after having received no payment since October, the plaintiffs

demanded payment from Wiseman on the equipment note. On January 30, 2004, Wiseman responded by complaining about the poor condition of the equipment and requesting a further abatement of payments under the note.

During this same time period, Alpert was not receiving timely rental payments. In October, 2003, Alpert wrote Wiseman demanding timely payment of the rent. Subsequently, Alpert agreed to abate the November, 2003 rent.

In January, 2004, Hartmann, Sr., was concerned about payment for the renovations and demanded security from Seawind and Wiseman. A $100,000 note was initially contemplated to run to JRInc. from Seawind and be guaranteed by Wiseman. On or about January 7, 2004, Seawind executed a $100,000 promissory note to JRCLLC, not JRInc. The note was guaranteed by Wiseman personally. The note was secured by a security agreement and a UCC-1 financing statement. It is unclear how the amount of the note was determined or which of the Hartmann entities had performed work on the premises. Additionally, there is no LLC record indicating majority approval of this note, as required by the operating agreement. On January 26, 2004, at 8:30 a.m., JRCLLC filed a UCC-1 from Seawind which included, within its scope, the kitchen equipment sold by the plaintiffs to Wiseman.

On February 11, 2004, Hartmann, Sr., without calling a meeting of Seawind, filed a notice with the Office of the Secretary of the State changing the statutory agent for the LLC.

In late February of 2004, Billy received a call from Hartmann, Jr., inquiring why Billy was hanging around the restaurant. Billy advised Hartmann, Jr., that his parents still owned the kitchen equipment. Hartmann, Jr.,

advised Billy that there might be a problem and suggested that they meet. Billy and his business partner Michael Klein met with Hartmann, Jr., and Hartmann, Sr., during the first week of March. The plaintiffs provided the Hartmanns with documentary evidence of the UCC-1 on the kitchen equipment. Hartmann, Sr., claimed that this was the first time he was aware of the plaintiffs' interests. Hartmann, Sr., further showed Billy the copy of the "Tzovolos" contract that he had been given by Wiseman. It was clearly a forgery and Hartmann became angry. Hartmann threatened Billy that "if . . . Billy tried to get the equipment he would tie him up with lawsuits that would exceed the value of the equipment and he would get nothing." Hartmann, Sr., stated he would make Wiseman bring his wife in and that he would resolve this matter in a "creative" way. Billy felt threatened by Hartmann, Sr.

After this meeting, the Hartmanns confronted Wiseman with regard to the plaintiffs' lien on the kitchen equipment. Wiseman admitted that he had given Hartmann, Sr., altered documents. The Hartmanns and Wiseman argued about Seawind's finances. Hartmann, Sr., claimed that Wiseman had not made the required capital contributions. Wiseman argued that the costs of the renovations that had been performed by Hartmann corporate entities were inflated and undocumented. Hartmann, Sr., unilaterally asserted that he and his sons should claim all of the tax losses attributable to Seawind.

On March 26, 2004, the Hartmanns' attorney claimed that Wiseman had fraudulently misrepresented his contributions to the LLC and demanded that the Hartmanns be bought out.

In response to the Hartmanns' demand, Wiseman e-mailed Hartmann, Sr., and asked him to put together "details on the dollars owed . . . ." Hartmann, Sr.,

responded by e-mail that Hartmann, Sr., was owed $70,000, Hartmann, Jr., was owed $6675.17 and JRInc. was owed $125,000. Curiously Hartmann, Sr., did not reference the promissory note from Seawind to JRCLLC in this summary of contributions by Hartmann, Sr., and his related corporate entities. Wiseman claimed the alleged contributions were inflated. The negotiations were not productive.

On April 1, 2004, JRCLLC declared the January 7, 2004 note from Seawind in default. On April 6, 2004, Hartmann, Sr., on behalf of Seawind, claimed that Wiseman was removing property from the restaurant. Even though Hartmann, Sr., was now aware of the plaintiffs' claims of a security interest, he contacted the Chef's Equipment Emporium LLC, to value the restaurant equipment and on April 7, 2004, received a bid for the purchase of the equipment.

On April 4, 2004, the restaurant was unable to open because staff had not been paid. On April 14, 2004, Wiseman advised Alpert that The Kitchen was closed. Wiseman gave Alpert permission to change the locks on the door. On April 14, 2004, Alpert issued a notice to quit to Wiseman and Seawind. On that same date, the plaintiffs' attorney wrote to Shepro asserting their UCC-1 rights and asserting a priority over any rights claimed by JRCLLC. It is unclear whether Shepro responded to the plaintiffs' attorney.

On April 24, 2004, the plaintiffs served their prejudgment remedy application on the defendants, including Hartmann, Sr., individually, and as agent for Seawind. Hartmann, Sr., was, at that time, pursuing permission from Alpert to remove the equipment under the asserted JRCLLC lien.

On April 14, 2004, in accordance with the terms of the lease and with the express permission of Wiseman, Alpert took steps to secure the premises and to change

the locks on the door. The Woodbridge police department responded to the building alarm at Selden Street when Alpert changed the locks on the door. The police spoke by telephone with Wiseman to confirm that he had authorized the changing of the locks at Selden Street. Jason R. Hartmann showed up at the premises and objected to the changing of the locks. Hartmann, Sr., also contested the changing of the locks and for the first time identified himself as a member of Seawind to Alpert. During these conversations, Lina Alpert felt threatened by Hartmann, Sr. At one point when discussing access to the premises, Hartmann, Sr., stated to her: "You just watch me, I'm coming in . . . I'll break the new locks." The police spoke with Hartmann, Sr., by telephone from Selden Street. Hartmann, Sr., told the police that he had "foreclosed on Seawind" and that the Hartmanns were taking steps to "cut their losses." When Hartmann, Sr., claimed a lien on the kitchen equipment, Lina Alpert advised him that to her knowledge, the plaintiffs had a lien on the equipment. Prior to April 14, 2004, the Hartmann defendants and their corporations had only been identified to Alpert as contractors working on the restaurant, not as members of Seawind.

On April 15, 2004, Alpert allowed the plaintiffs to enter the restaurant to photograph and document the contents of the restaurant. The plaintiffs did not remove any equipment from the premises. The plaintiffs noticed that some of the kitchen equipment in which they claimed a security interest was no longer on the premises. The plaintiffs provided Alpert with their contract with Wiseman and Seawind, the bill of sale to Wiseman and a list of the secured restaurant equipment.

Subsequent to Alpert changing the locks on Selden Street, Hartmann, Sr., sought, through Shepro, to gain access to the premises in order to remove equipment. On April 16, 2004, Shepro represented on behalf of his

clients that "Jason Roberts . . . will take only what it has a lien on and will hold your client harmless from claims of others that it took property of others, provided it gets immediate access." It is unclear whether Shepro was referring to JRInc., JRCLLC or some other entity. At the time this representation was made, Hartmann, Sr., was in possession of the Tzovolos documents, was aware that the equipment had been conveyed by a bill of sale to Wiseman, rather than Seawind, and that JRCLLC's lien on the kitchen equipment was based upon title to the kitchen equipment being in Seawind.

Relying on the indemnification agreement, Alpert allowed Hartmann, Sr., access to Selden Street on April 26, 2004.

During the trial, Hartmann, Sr., denied that he had authorized his attorney to agree to indemnification or any limitation on his right to recover property at Selden Street. After a short recess, Hartmann, Sr., changed his testimony to say that he authorized his attorney to do whatever it took to get access to "his" property.

On April 26, 2004, two days after being served with the plaintiffs' prejudgment remedy application, Hartmann, Sr., and his sons arrived at Selden Street with at least two panel trucks and several men to remove equipment. Hartmann, Sr., and his men worked from approximately 6 a.m. until mid-afternoon. Alpert remained at Selden Street to observe their activities. In the early afternoon, Ona Alpert confronted Hartmann, Jr., and Jason R. Hartmann as they were removing a dough mixer. Ona Alpert was aware that the plaintiffs claimed a security interest in the mixer. Hartmann, Jr., stated "I'm taking what I can. I'm taking what's mine . . . ." (Emphasis added.) Ona Alpert called the plaintiffs. When the plaintiffs arrived, the Hartmanns and their helpers immediately left with the equipment they had already loaded into their trucks. The plaintiffs noticed that some of the

equipment that they had documented in their April 15, 2004 photographs was missing. They took another set of photographs on April 26, 2004. Specifically, the plaintiffs identified the following items of equipment that were on the premises on April 15, 2004, but were not on the premises after April 26, 2004: a Hobart commercial slicer, a Hobart dough mixer and accessories and an Acme dough roller. These items had been removed from the premises at the direction of Hartmann, Sr., by the Hartmann sons or by employees of the Hartmann corporate entities. There is no credible evidence that Alpert took any of the kitchen equipment, or any other personalty, at Selden Street. There is no credible evidence that Alpert allowed any persons other than the plaintiffs and the Hartmanns access to the premises between April 14 and April 26, 2004.

Wiseman stated that the Hobart commercial slicer, Hobart dough mixer, and Acme dough roller were at the restaurant premises the last time he accessed the premises in the first week of April. Wiseman further claimed that a five foot chest freezer, shelving, a gyro machine and a gas flattop grill had been removed to a warehouse of JRInc. Hartmann, Sr., through Shepro, disputed Wiseman's report and claimed that some of the equipment was discarded or had broken down. Hartmann, Sr., later claimed to "discover" some of the missing equipment at his warehouse.

Alpert filed an eviction action against Seawind and Wiseman. Initially, Shepro appeared for and represented Seawind. On May 21, 2004, a judgment was rendered in favor of Alpert and the defendants were ordered to remove their possessions on or before June 7, 2004. The judgment advised the defendants that "if you do not claim your possessions and personal effects and pay the removal and storage costs within fifteen days after the date listed below, your possessions and personal effects will be forfeited to the landlord." On

June 7, 2004, a marshal performed an inventory of the property left on the premises after the entry of the judgment.

Hartmann, Sr., did not return to Selden Street after April 26, 2004, and did not again request permission from Alpert to enter the premises until August 12, 2004.

On August 18, 2004, JRInc., through Shepro, claimed certain remaining property. This claim was asserted long after Shepro knew or should have known that under the terms of the eviction, the time for claiming property had long expired. Despite this knowledge, Shepro threatened to sue and has sued Alpert on behalf of JRInc.

On May 1, 2004, JRInc. filed a mechanic's lien against Alpert in the amount of $139,867.98. JRInc. claimed that it furnished labor and materials in that amount to Seawind between September 29, 2003, and February 27, 2004. There is a lawsuit pending in the judicial district of Ansonia-Milford regarding the asserted mechanic's lien. Hartmann, Sr., testified that the consideration for the Seawind note to JRCLLC was for work performed at Selden Street. It appears this same work is the foundation for the mechanic's lien claim. This lawsuit has not been consolidated with these cases.

On October 16, 2005, Wiseman filed for bankruptcy and on February 13, 2006, he received his discharge from the Bankruptcy Court.

When the eviction process was completed, Alpert again sought to lease the premises at Selden Street. As demonstrated in the marshal's inventory at the conclusion of the foreclosure process, some equipment remained in the premises. In July of 2004, the plaintiffs sold the secured kitchen equipment that had not been removed by Hartmann, Sr., for $5000. They have applied that sum to the indebtedness of Wiseman. After credits,

a sum of $21,490 is currently due on the promissory note from Wiseman.

At the conclusion of the hearings in this case, all counsel submitted affidavits regarding their request for attorney's fees. The plaintiffs submitted to the court the written fee agreement they signed at the commencement of this collection litigation. It was a 33.3 percent contingency fee agreement. Counsel seeks an award of attorney's fees based upon a hourly rate, however, because the litigation was more complex than initially anticipated. Trial counsel seeks an award of $39,640 based upon his affidavit and further requests an award for the plaintiffs' prior lawyer in the amount of $4565.

Shepro, which represents the individual Hartmann defendants, JRInc. and JRCLLC, has filed an affidavit seeking legal fees and costs in the amount of $111,461.87. These fees cover the Tzovolos action and the action filed by JRInc. against Alpert. These fees do not cover the mechanic's lien foreclosure action pending in the judicial district of Ansonia-Milford.

Alpert has incurred legal fees and costs of $28,395 in the defense of the claims asserted in this litigation.

The plaintiffs claim that Hartmann, Sr., manipulated the finances of Seawind and his other corporations, JRInc. and JRCLLC, so as to benefit himself and to the detriment of the other creditors of Seawind. On March 24, 2004, Hartmann, Sr., prepared a summary of the accounts payable of Seawind. This summary did not include the debt of the plaintiffs but did include a claim of $117,584 due to JRCLLC. Again, curiously the obligation that would support the mechanic's lien in favor of JRInc. is not listed. The balance sheet further showed loans payable to JRInc., Hartmann, Sr., Hartmann, Jr., and Real Estate Plus, Inc., another corporation owned by Hartmann, Sr. After the restaurant was closed and during a period of time when Hartmann, Sr., was aware

of the plaintiffs' claims against Seawind and Wiseman, he issued a $1000 check from the Seawind checking account to JRInc.

Hartmann, Sr., is fifty-eight years old. Since leaving high school, he has been working on a regular and constant basis. He eventually went into business for himself. He owns 100 percent of Real Estate Plus, Inc. In 1990, he incorporated JRInc. and he currently owns approximately 80 percent of the company. He also formed JRCLLC in October of 2003. Hartmann gave his wife a majority interest in the company so that it could compete for minority or gender designated bid projects. Since August of 2003, he was a member of Seawind. He has one bookkeeper for all of the entities that he operates.

Generally, Hartmann, Sr., was not a credible witness. His memory was faulty and self-serving and he frequently took contradictory positions at different points in time. At one point during his testimony he stated: "I usually forget things the next day."

## IV

## RESOLUTION OF THE PRELIMINARY ISSUES

### A

### Title to the Kitchen Equipment

General Statutes § 42a-9-609 (a) provides in relevant part: "After default, a secured party: (1) May take possession of the collateral; and (2) Without removal, may render equipment unusable and dispose of collateral on a debtor's premises under section 42a-9-610. . . ." Regarding the disposition of the collateral after default, General Statutes § 42a-9-610 (a) provides in relevant part: "[A] secured party may sell, lease, license or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable

preparation or processing." The evidence establishes that Chaouki was in default under the terms of his agreement with the plaintiffs. On June 3, 2003, the plaintiffs appeared in court at a hearing involving litigation between Chaouki and his business partner. On the record, Chaouki and his business associates explicitly released all claims to the equipment and surrendered and returned the equipment to the plaintiffs. Thus, as authorized by statute, they recovered possession of their equipment. Further, as authorized by statute, on August 18, 2003, they sold the kitchen equipment to Wiseman.

Title to the conveyed kitchen equipment was placed in Wiseman's name rather than Seawind. Each party accepted performance in the manner that the performance was tendered. The promissory note expressly acknowledged that Wiseman gave the plaintiffs a security interest in the kitchen equipment to secure payment. The August 18, 2003 purchase and sale agreement establishes an agreement that the plaintiffs would retain a security interest in the kitchen equipment. The evidence also establishes that the plaintiffs perfected their security in the kitchen equipment by filing a UCC-1 with the Office of the Secretary of the State on August 21, 2003. As a manager of Seawind, Wiseman was authorized by the operating agreement to act on behalf of the LLC. JRCLLC, whose claim rests on Seawind's claim of title, could not receive from Seawind or Wiseman any better title to the equipment than that which Wiseman or Seawind received from the plaintiffs on August 18, 2003.

The attacks by the Hartmann defendants on the plaintiffs' title are without support of any credible evidence. There is not a scintilla of evidence offered that would place title in the kitchen equipment in Seawind rather than Wiseman. Seawind could not give a security interest in kitchen equipment that it did not own. JRCLLC may have a valid security interest with regard to other

personalty that was owned by Seawind at the time of the January 7, 2004 security agreement, but it did not, and could not, have a valid superior security interest in the kitchen equipment.

JRCLLC claims that since the purchase and sale agreement was executed by Seawind and Wiseman, there was no authority to file a UCC-1 against only one of the debtors, Wiseman. It argues that in accordance with the terms of the agreement, title should have been placed in Wiseman and Seawind. Wiseman, however, as a manager of Seawind, accepted the performance tendered by the plaintiffs.

JRCLLC further claims that the documentation of this transaction did not contain a separate agreement authorizing the purchase money security interest. This argument is based on General Statutes § 42a-9-203. The court finds that the plaintiffs' purchase money security agreement with Wiseman was enforceable because value was given, the debtor, Wiseman, had title to the kitchen equipment and the purchase and sale agreement and the promissory note that memorialized the security agreement were authenticated by Wiseman.

The court further finds that in March of 2004, Hartmann, Sr., and JRCLLC became aware that the documentation they relied on for asserting an interest in the kitchen equipment had been altered by Wiseman. They could not in good faith assert claim of a security interest in the kitchen equipment founded on the altered document. They further had been provided with the documentation of the August 18, 2003 transaction from the plaintiffs to Wiseman that placed title to the kitchen equipment in Wiseman and granted the plaintiffs a purchase money security interest. The court finds that the plaintiffs have proved by a preponderance of the evidence that they had good title to the kitchen equipment

on August 19, 2003, and that they conveyed the equipment to Wiseman on that date. The plaintiffs held a purchase money security interest in the equipment. Seawind could not give JRCLLC a security interest in what it did not own.

## B

Right to Possession of Selden Street as of April 14, 2004

Under the terms of the August lease between Seawind and Alpert, Seawind was entitled to possession and quiet enjoyment of the premises during the term of the lease. The lease gave certain rights to Alpert in the event that the premises were vacated and/or abandoned. At all times prior to April 14, 2004, Wiseman held himself out as a manager and member of Seawind. Pursuant to the terms of the operating agreement for Seawind, Wiseman was recognized by the other members of the LLC to be a manager of the LLC and was authorized to act for and on behalf of the LLC. There was no credible evidence that Hartmann, Sr., or any of his sons identified themselves as members or managers of Seawind to Alpert prior to April 14, 2004.

Based upon facts previously found, the court concludes by a preponderance of the evidence, that under the terms of the lease and as expressly authorized by a manager of Seawind, Alpert was entitled to change the locks and to secure the premises at Selden Street. They later perfected their rights to possession through the summary process action.

## C

Was Any Kitchen Equipment Covered by the UCC-1 Granted to the Plaintiffs Removed from the Premises?

The plaintiffs identified a substantial number of items that were missing from the restaurant premises on April 15, 2004. From the testimony of Wiseman, the court

finds that some of the equipment ceased to function and was not replaced. Some of the equipment was not useful to Wiseman and some of the equipment was removed to offsite storage. There was correspondence between Wiseman and the plaintiffs complaining about the condition of the equipment. There is insufficient proof offered by the plaintiffs as to the disposition of the equipment that was identified as missing on April 15, 2004. The state of the testimony was such that the court, with the exception of the items subsequently located in the Hartmann storage facilities, cannot determine what was removed, why it was removed or who removed the equipment from the premises.

The evidence is sufficient for the court to determine, however, what happened to the equipment that was present on the premises on April 15, 2004, but was missing after Hartmann, Sr., left the premises on April 26, 2004. The court concludes that Alpert controlled and secured the premises after April 14, 2004. There is no credible evidence that either Alpert, the plaintiffs, or a third party removed items from the premises between April 14 and April 26, 2004. When the Hartmann defendants negotiated entry to the premises on April 26, 2004, the court finds by clear and convincing evidence that the Hartmanns were intent on removing every piece of equipment or furniture they could without regard to the plaintiffs' security interest. At the time this equipment was removed from the premises, the Hartmann defendants were aware of the security interests held by the plaintiffs and were aware of the plaintiffs' action to seek a prejudgment remedy to secure the equipment. The Hartmann defendants sought to preempt the court from resolving the conflicting security interest claims by removing and disposing of the secured kitchen equipment. Further, the court finds this conduct is consistent with the threats by Hartmann, Sr., to use the legal system to cost the plaintiffs more than their equipment

was worth and his statements to the police and to Lina Alpert on April 14, 2004. Despite Hartmann, Sr.'s knowledge that he had been misled by his business partner, Wiseman, Hartmann, Sr., and his sons treated Seawind as theirs to do with as they wished. They were angry that they had been duped by their business partner and angry that they had failed to act in a commercially reasonable manner before entering into business with Wiseman.

While it is unfortunate that Wiseman took advantage of Hartmann, Sr., by providing him with an altered purchase and sale agreement regarding the equipment, the alteration cannot be a justification for the Hartmann defendants' conduct toward the plaintiffs or Alpert. Neither the plaintiffs nor Alpert had anything to do with the decision of Hartmann, Sr., to go into business with Wiseman and neither withheld from Hartmann, Sr., any information or prevented Hartmann, Sr., from using due diligence before agreeing to become a member of Seawind.

The court finds, by clear and convincing evidence, that Hartmann, Sr., through his family and employees, removed the Hobart dough mixer, the Hobart commercial slicer and the Acme dough roller on April 26, 2004. The court, based upon the evidence, finds that the value of the Hobart dough mixer was $8000, the value of the Hobart commercial slicer was $2200, and the value of the Acme dough roller was $2500.

## D

### Piercing the Corporate Veil—Count Seven of the Plaintiffs' Complaint

The plaintiffs allege that Hartmann, Sr., and his sons have utilized their control of Seawind, JRInc. and JRCLLC for their individual purposes and for the purpose of defrauding or hindering the plaintiffs as creditors of Seawind and as the possessors of a perfected

security interest in the kitchen equipment used by Sea-wind. The plaintiffs claim that equity demands that liability for the corporate manipulations complained of be placed on the individual defendants as shareholders, managers or members of the corporate entities.

"A corporation is a separate legal entity, separate and apart from its stockholders." *State* v. *Radzvilowicz*, 47 Conn. App. 1, 18, 703 A.2d 767, cert. denied, 243 Conn. 955, 704 A.2d 806 (1997). That principle also is applicable to limited liability companies and their members. General Statutes § 34-133. Nevertheless "[c]ourts will . . . disregard the fiction of a separate legal entity to pierce the shield of immunity afforded by the corporate structure in a situation in which the corporate entity has been so controlled and dominated that justice requires liability to be imposed on the real actor. . . . [Our Supreme Court has] affirmed judgments disregarding the corporate entity and imposing individual stockholder liability when a corporation is a mere instrumentality or agent of another corporation or individual owning all or most of its stock." (Citations omitted; internal quotation marks omitted.) *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*, 187 Conn. 544, 552–53, 447 A.2d 406 (1982).

"The concept of piercing the corporate veil is equitable in nature" and courts should pierce the corporate veil "only under exceptional circumstances." (Internal quotation marks omitted.) Id., 557. "It is clear that the key factor in any decision to disregard the separate corporate entity is the element of control or influence exercised by the individual sought to be held liable over corporate affairs." Id., 556–57. The court must "avoid an over-rigid preoccupation with questions of structure . . . and apply the preexisting and overarching principle that liability is imposed to reach an equitable result." (Citations omitted; internal quotation marks omitted.) *LiButti* v. *United States*, 107 F.3d 110, 119 (2d Cir.

1997). The party seeking to pierce the corporate veil bears the burden of proof. *Season-All Industries, Inc.* v. *R. J. Grosso, Inc.*, 213 Conn. 486, 492, 569 A.2d 32 (1990).

Connecticut recognizes two theories under which it will permit the corporate veil to be pierced and the protection of the corporate structure to be set aside. Those theories also apply to the protection afforded by a limited liability company. See *Litchfield Asset Management Corp.* v. *Howell*, 70 Conn. App. 133, 147, 799 A.2d 298, cert. denied, 261 Conn. 911, 806 A.2d 49 (2002). The first theory is the instrumentality rule. "The instrumentality rule requires, in any case but an express agency, proof of three elements: (1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of [the] plaintiff's legal rights; and (3) that the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of." (Internal quotation marks omitted.) *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*, supra, 187 Conn. 553.

The second theory is the identity rule. The identity rule is typically used to reach beyond the corporate veil to another corporation but may also be used to reach an individual. *Klopp* v. *Thermal-Sash, Inc.*, 13 Conn. App. 87, 89 n.3, 534 A.2d 907 (1987). "If [the] plaintiff can show that there was such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic

entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise. . . . [*Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*, supra, 187 Conn. 554].” (Internal quotation marks omitted.) *Morris* v. *Cee Dee, LLC,* 90 Conn. App. 403, 414–15, 877 A.2d 899, cert. denied, 275 Conn. 929, 883 A.2d 1245 (2005). “The identity rule primarily applies to prevent injustice in the situation where two corporate entities are, in reality, controlled as one enterprise because of the existence of common owners, officers, directors or shareholders and because of the lack of observance of corporate formalities between the two entities.” (Internal quotation marks omitted.) *Litchfield Asset Management Corp.* v. *Howell,* supra, 70 Conn. App. 156. “There must be such domination of finances, policies and practices that the controlled corporation has, so to speak, no separate mind, will, or existence of its own and is but a business conduit for its principal.” (Internal quotation marks omitted.) Id.

E

Instrumentality Test

The first element of the instrumentality test, as stated above, is whether evidence of control and domination is present under the facts of the present case. “Courts, in assessing whether an entity is dominated or controlled, have looked for the presence of a number of factors. Those include: (1) the absence of corporate formalities; (2) inadequate capitalization; (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes; (4) overlapping ownership, officers, directors, personnel; (5) common office space, address, phones; (6) the amount of business discretion by the allegedly dominated corporation; (7) whether the corporations dealt with each other at arm’s length; (8) whether the corporations are treated as independent

profit centers; (9) payment or guarantee of debts of the dominated corporation; and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own." (Internal quotation marks omitted.) Id., 152–53; see also *Hale Propeller, LLC* v. *Ryan Marine Products Pty., Ltd.*, 98 F. Sup. 2d 260, 265 (D. Conn. 2000). "[W]hen [a] corporation is the mere alter ego, or business conduit of a person, it may be disregarded." (Internal quotation marks omitted.) *De Leonardis* v. *Subway Sandwich Shops, Inc.*, 35 Conn. App. 353, 358, 646 A.2d 230, cert. denied, 231 Conn. 925, 648 A.2d 162 (1994).

The Hartmann sons elected not to testify. The evidence has demonstrated that Hartmann, Sr., owns and manages several LLCs, or corporations, several of which have been involved in the transactions that form the basis of the present case. He and his sons have utilized the corporate entities and LLCs in furtherance of their business goals. The facts of the present case satisfy several of the above elements, indicating that the corporate veil of each of the Hartmann LLCs should not be left intact to shield Hartmann and his sons from personal liability as a result of their conduct.

The evidence establishes a lack of corporate formalities, thus satisfying the first element. Pursuant to the operating agreement of Seawind, "[a]ny transactions between the [c]ompany and [m]embers or their affiliates not specified in this [a]greement shall require the approval of a majority vote of the [p]articipating [p]ercentage." Hartmann, Sr., consistently ignored this provision while transacting business between Seawind and his various LLCs as the evidence fails to establish any record of adherence to the majority vote provision.

Regarding the fourth and fifth factors, Hartmann, Sr., has created and/or controlled several LLCs in the pursuit of business opportunities. Hartmann, Sr., as of

August, 2003, was active in the operation of Seawind. Hartmann, Sr., was a comanager of Seawind, was designated the tax manager and was responsible for keeping the books. He also owned and controlled JRInc. and JRCLLC. JRCLLC was formed in October of 2003, and although it is headed by Hartmann, Sr.'s wife, Hartmann, Sr., testified that the nominal involvement of his wife in the business venture was so that JRCLLC might qualify for "minority owned" business contracts. In addition to sharing the same core set of principal officers, the principal office of each of these LLCs was designated as the same address, in Milford, thus satisfying the fifth factor.

The interplay of the numerous LLCs also demonstrate the satisfaction of the seventh and eighth factors. While the involvement of multiple LLCs controlled by Hartmann does not in and of itself establish grounds for the piercing of the corporate veil, the conduct in fact of the LLCs indicates a lack of separate identities. The evidence indicates that the individual LLCs were used interchangeably by Hartmann, Sr., as need arose and even Hartmann, Sr., failed to differentiate between the individual entities while conducting his business.

The seventh factor, a lack of arm's length dealing, is demonstrated by the billing for the Seawind renovation project, which was handled in a confusing and misleading manner. The exhibits offered at trial had numerous invoices that were identical except for the fact that one was issued by JRInc. and another was issued by JRCLLC. There were no independent accounting controls between Seawind as the debtor, and JRInc. or JRCLLC as the contractors. All of the entities were served by the same bookkeeper who also was a bookkeeper for Real Estate Plus, Inc. Furthermore, each of the entities was represented by a single law firm, Shepro, even when they had conflicting interests and when at least one, Seawind, was insolvent.

The eighth factor is satisfied through evidence that the finances and obligations of JRInc. and JRCLLC were constantly shifting between the two entities. Hartmann, Sr., used his position in Seawind, and a threat to withhold wages from Wiseman, as a means of securing a $100,000 promissory note and a security interest from Seawind to another of his entities, JRCLLC. The consideration for the note was claimed to be the renovations performed at Selden Street. These same renovations, however, were later claimed to have been performed by another of his corporate entities, JRInc., when JRInc. asserted a mechanic's lien of $139,000 against Alpert, the landlord. Hartmann, Sr., has taken contradictory positions with regard to who did the work.

Given the evidence, the court finds by clear and convincing evidence that Hartmann, Sr., and sons exercised dominion and control over JRInc., JRCLLC, and Seawind. The facts of this case establish that Hartmanns' corporate entities are their mere alter ego and their own personal business conduit, thus satisfying the first element of the instrumentality test. The corporate entities owned and controlled by the Hartmanns lacked a separate mind, will or existence of their own.

Turning next to the second element of the instrumentality test, the court finds that the control exerted by the Hartmanns was purposefully used to commit a "fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of [the] plaintiff's legal rights . . . ." (Internal quotation marks omitted.) *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*, supra, 187 Conn. 553. The control exerted by Hartmann, Sr., over Seawind, JRInc. and JRCLLC has been used to frustrate the efforts of the plaintiffs to obtain the kitchen equipment that secured their debt from Wiseman. For example, in April of 2004, the doors of Seawind's restaurant were closed for business, its kitchen equipment was

being appraised for sale, plans were being made to remove custom furnishings in the restaurant, and Seawind was in default on its lease and its list of accounts payable exceeded its assets. At this time, and with full awareness of the above situation, Hartmann, Sr., signed a $1000 check from Seawind's checking account to one of his corporate entities. The evidence indicates that he exercised his control over Seawind to wrongfully give preference to other entities he controlled.

Additionally, regarding the kitchen equipment, the court has previously noted that Hartmann, Sr., and/or his attorney, Shepro, were aware of the perfected security interest held by the plaintiffs and the faulty foundation of JRCLLC's asserted interest in the kitchen equipment. At a time when he was aware of the filing of the instant action, Hartmann, Sr., ordered Shepro to do anything necessary to get back into Selden Street to remove "his" property. Hartmann, Sr., took steps to give a preference to the debts owned to his corporate entities as opposed to the secured interest of the plaintiffs or other creditors. These steps included his decision to remove kitchen equipment from the property, knowing that it was subject to the plaintiffs' security interest, when given access by Alpert to remove only the items subject to a lien in his favor. The court finds that Hartmann, Sr., used his position of control to wrongfully contravene the rights of others to his own benefit. The conduct of Hartmann, Sr., therefore, is sufficient to satisfy the second element of the instrumentality rule.

Finally, the third element, requiring that "the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of," is also satisfied in the present case. (Internal quotation marks omitted.) *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*, supra, 187 Conn. 553. As a result of the actions of Hartmann, Sr., on behalf of his numerous corporate

entities, the plaintiffs were injured in that the kitchen equipment that they had a security interest in was removed and the plaintiffs have been entangled in litigation involving numerous corporate entities controlled by Hartmann, Sr. He successfully exerted his control over the various corporate entities to the plaintiffs' detriment.

With regard to the Hartmanns' corporate entities, the court finds by clear and convincing evidence that there is an absence of corporate formalities, overlapping ownership or managers, common office space, a lack of arm's length transactions, and preferences exercised in favor of the dominant corporation or entities controlled exclusively by Hartmann, Sr., or his family members. Additionally, the facts indicate that the plaintiffs have shown that there was such a unity of interest and ownership that the independence of Seawind, JRInc. and JRCLLC had in effect ceased. The adherence to the fiction of separate corporate identities would serve only to defeat justice and equity. The court concludes that it is appropriate, and justice requires, that in this case the corporate entities Seawind, JRInc. and JRCLLC be pierced and that the responsibility for their conduct be placed upon Hartmann, Sr., Hartmann, Jr., and Jason R. Hartmann.

## V

## DISCUSSION OF THEORIES OF LIABILITY

### A

### First Count of the Plaintiffs' Complaint— Breach of Contract

The first count of the complaint sounds in breach of contract against Seawind and Wiseman. As Wiseman has filed for protection from the Bankruptcy Court and his debts have been discharged, the court will consider only the arguments as they relate to Seawind.

Regarding Seawind, the evidence establishes and the plaintiffs have proven by the fair preponderance of the evidence that on July 15, 2003, they entered into a written purchase and sale agreement with Wiseman and Seawind for kitchen equipment. The agreement set a purchase price of $35,000 for the equipment and provided that the equipment would be paid for by $10,000 in cash and the $25,000 balance would be paid by means of a promissory note. The deal closed on August 19, 2003. The plaintiffs tendered a bill of sale solely to Wiseman and Wiseman signed and tendered the $25,000 dollar promissory note to the sellers. Seawind paid the $10,000 in cash and paid three payments under the promissory note on behalf of Wiseman, and thereafter defaulted on January 1, 2004. The plaintiffs were able to resell some of the equipment that secured the purchase and sale agreement and promissory note and they realized $5000 from the proceeds of that sale. The plaintiffs claim they are now due under the purchase and sale agreements the sum of $21,490.

"[T]he key elements of a breach of contract action considered by the court are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." *Bouchard* v. *Sundberg*, 80 Conn. App. 180, 189, 834 A.2d 744 (2003). However, the ability to recover for a breach of a purchase and sale agreement can be affected by the merger doctrine. The Connecticut courts have long recognized the doctrine of merger by deed. See *Knight* v. *Breckheimer*, 3 Conn. App. 487, 490, 489 A.2d 1066 (1985). "[U]nder the principle of merger by deed, the terms of the deed would automatically replace and supersede the terms of the underlying contract, absent a reservation of collateral rights." *Mongillo* v. *Commissioner of Transportation*, 214 Conn. 225, 231, 571 A.2d 112 (1990). Although the doctrine of merger by deed arises in the

context of real estate transactions, the facts of the present case are similar enough to warrant the application of the principles underlying this doctrine.

Regarding the specific allegations that Seawind has breached the purchase and sale agreement by failing to make the required payments and by failing to maintain hazard insurance, the court finds that the plaintiffs accepted performance by Wiseman alone. Although Seawind was a party to the original purchase and sale agreement, the closing transactions involving the transfer of the kitchen equipment, including the promissory note and the bill of sale, involved only Wiseman. Under the original agreement, Seawind assented to the purchase money security interest and the maintenance of hazard insurance, but no more. Thus, the purchase and sale agreement was fully performed by Seawind at the date of closing, and it had no obligation to make payments under the promissory note. There was no evidence of the lack of hazard insurance. The plaintiffs are not entitled to monetary damages for breach of contract claims against Seawind based upon the failure to make promissory note payments.

B

### Second Count—Breach of Contract—
### *Tzovolos* v. *Wiseman*

As to the second count, the plaintiffs seek to enforce the obligations of a promissory note executed by Wiseman. As Wiseman has filed for protection from the Bankruptcy Court and his debts have been discharged, the court will not render a judgment or enter orders relating to the promissory note.

C

### Third Count—Unjust Enrichment—
### *Tzovolos* v. *Seawind*

In this count the plaintiffs seek recovery on a theory of unjust enrichment as against Wiseman and Seawind.

In their posttrial brief, the plaintiffs indicated they were not pursuing recovery under this count and therefore the court does not address the same.

### D

Fourth Count—Conversion—*Tzovolos* v. *Hartmann, Sr., Hartmann, Jr., Jason R. Hartmann* and *JRCLLC* Counterclaim—Conversion—*JRCLLC* v. *Tzovolos*

In count four, the plaintiffs seek to recover damages at common law for the conversion of their security interest in the kitchen equipment. "The tort of [c]onversion occurs when one, without authorization, assumes and exercises ownership over property belonging to another, to the exclusion of the owner's rights. . . . Thus, [c]onversion is some unauthorized act which deprives another of his property permanently or for an indefinite time; some unauthorized assumption and exercise of powers of the owner to his harm. The essence of the wrong is that the property rights of the plaintiff have been dealt with in a manner adverse to him, inconsistent with his right of dominion and to his harm. . . . The term owner is one of general application and includes one having an interest other than the full legal and beneficial title. . . . The word owner is one of flexible meaning, and it varies from an absolute proprietary interest to a mere possessory right." (Citation omitted; internal quotation marks omitted.) *Deming* v. *Nationwide Mutual Ins. Co.*, 279 Conn. 745, 770, 905 A.2d 623 (2006). "Although proof of absolute and unqualified title is, of course, sufficient, proof of an immediate right to possession at the time of conversion is all that is required in the way of title or possession to enable the plaintiff to recover." *Devitt* v. *Manulik*, 176 Conn. 657, 660, 410 A.2d 465 (1979). The intent required for a conversion is merely an intent to exercise dominion or control over an item even if one reasonably believes that the item is one's own. *Luciani* v. *Stop &*

*Shop Cos.*, 15 Conn. App. 407, 411–12, 544 A.2d 1238, cert. denied, 209 Conn. 809, 548 A.2d 437 (1988).

Thus, for the plaintiffs to establish a prima facie case of conversion they must prove that: (1) the kitchen equipment belonged to them as a result of a superior security interest; (2) the defendants' action in removing the equipment from the premises deprived the plaintiffs of the equipment; (3) the defendants were not authorized by the plaintiffs to remove the equipment; and (4) the defendants' action harmed the plaintiffs. See *Label Systems Corp.* v. *Aghamohammadi*, 270 Conn. 291, 330, 852 A.2d 703 (2004).

The court finds by clear and convincing evidence, that Hartmann and sons, through JRCLLC, have converted several items of property in which the plaintiffs had security rights, specifically the Hobart dough mixer, the Hobart commercial slicer, and the Acme dough roller. Pursuant to their agreement with Wiseman, the plaintiffs were given a security interest in these particular pieces of kitchen equipment. This interest was perfected on August 21, 2003, when the plaintiffs filed a UCC-1 with the Office of the Secretary of the State. Upon Wiseman's default of the promissory note, the plaintiffs became entitled to possession of the equipment. Their superior right to the equipment satisfies the first element of the prima facie case. The second and third elements are satisfied because the evidence establishes that the property subject to the plaintiffs' security interest was removed by the defendants on April 15, 2004, when Hartmann, Sr., gained access to Selden Street pursuant to an agreement with Alpert to only remove his property. The plaintiffs did not authorize this action. As a result of the actions of Hartmann, Sr., on behalf of his corporate entities, the plaintiffs sustained injury. Despite the plaintiffs' perfected security interest in the equipment, Hartmann, Sr., Hartmann, Jr., Jason R. Hartmann, and JRCLLC interfered with

that right and converted the Hobart dough mixer, which had a value of $8000, the Hobart commercial slicer which had a value of $2200 and the Acme dough roller which had a value of $2500. The plaintiffs have been damaged by each of the defendants jointly and severally in the amount of $12,700, thus satisfying the fourth element.

In addition to recovering for common-law conversion, the plaintiffs are also seeking punitive damages and attorney's fees. "In Connecticut, punitive damages may be based either on statute or, in the absence of a statutory provision, common law." *Supreme Industries, Inc.* v. *Bloomfield*, Superior Court, judicial district of Hartford, Docket No. X03-CV-03-4022269 (March 8, 2007). With respect to common-law punitive damages, it is established that "[p]unitive damages are awarded when the evidence shows a reckless indifference to the rights of others or an intentional and wanton violation of those rights." (Internal quotation marks omitted.) *Harty* v. *Cantor Fitzgerald & Co.*, 275 Conn. 72, 92–93, 881 A.2d 139 (2005). If awarded, common-law punitive damages "are limited to the plaintiff's attorney's fees and nontaxable costs, and thus serve a function that is both compensatory and punitive." *Bodner* v. *United Services Automobile Assn.*, 222 Conn. 480, 492, 610 A.2d 1212 (1992).

The following facts support an award of punitive damages. Hartmann, Sr., Hartmann, Jr., and Jason R. Hartmann individually and Hartmann, Sr., in his capacity as an officer and agent of JRCLLC, knew in March of 2004, that the plaintiffs had a security interest in the kitchen equipment located at Selden Street. The plaintiffs' son, Billy, provided Hartmann, Sr., with a copy of the purchase and sale agreement, the promissory note and the UCC-1 filing. At that same meeting, Billy advised Hartmann, Sr., that the purchase and sale agreement provided by Wiseman to Hartmann was

altered. In a follow-up to that meeting, Hartmann, Sr., met with Wiseman, who admitted that he had provided inaccurate documentation to his business partner. The Hartmanns thereafter signed and issued a default notice which stated "kitchen equipment payments are delinquent and the owner is threatening to take the equipment. The equipment was supposed to be part of your capital contribution and it is not." (Emphasis added.) The owner referred to in the default notice was the plaintiffs. Additionally, Hartmann, Sr., was served with a copy of the prejudgment remedy application and the restraining order application that the plaintiffs filed to commence this action on April 24, 2006. During this time period, Hartmann, Sr., individually and in his capacity of an officer or a manager of Seawind and JRCLLC, knew Seawind was insolvent and could not pay its bills. The accounts payable summary presented and created by the office staff of Hartmann, Sr., which worked for all of his corporate entities, establishes his knowledge of the financial difficulties of Seawind. Despite this knowledge, Hartmann, Sr., instructed his sons and employees to remove everything they could from the restaurant premises at Selden Street, including kitchen equipment that was covered by the plaintiffs' security interest.

The evidence is overwhelming that Hartmann and sons intended to deprive the plaintiffs of the benefit of their security interest in kitchen equipment remaining at Selden Street at the time of the closing of the restaurant. In his initial meeting with Billy, Hartmann, Sr., advised Billy that if he did not go along with his plan to recover the money, the plaintiffs would have to spend more money than his equipment was worth on legal fees. Further, Hartmann, Sr., as a manager of Seawind, and knowing that Seawind was unable to pay its debts as they came due, was aware of the default under the terms of the purchase and sale contract. As an officer of JRCLLC, Hartmann, Sr., knew that the security interests

that he thought he had on behalf of his LLC, could not apply to the restaurant equipment because Seawind never had title to that equipment.

Finally, the statement of Hartmann, Sr., to the police at the time the locks were changed on the restaurant indicates his lack of respect for the rights of others in the recovery of this equipment.

The court finds that the defendants Hartmann, Sr., Hartmann, Jr., and Jason R. Hartmann acted dishonestly and with intentional disregard to the rights of the plaintiffs, and, therefore, an award of common-law punitive damages is appropriate. The evidence establishes that they were aware of the plaintiffs' superior rights in the kitchen equipment, and intentionally disregarded those rights for their own benefit when they converted the Hobart dough mixer, the Hobart commercial slicer and the Acme dough roller to their own use. Under the common law, punitive damages are awarded in the form of attorney's fees.

In setting attorney's fees when a contingency fee agreement exists, the trial court must first "analyze the terms of the agreement itself. . . . If the agreement is, by its terms, reasonable, the trial court may depart from its terms only when necessary to prevent 'substantial unfairness' to the party, typically a defendant, who bears the ultimate responsibility for payment of the fee. . . . By contrast, if the trial court concludes that the agreement is, by its terms, unreasonable, it may exercise its discretion and award a reasonable fee in accordance with the factors enumerated in rule 1.5 (a) of the Rules of Professional Conduct." (Citations omitted.) *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 270–72, 828 A.2d 64 (2003). Rule 1.5 (a) of the Rules of Professional Conduct provides the following factors to be relevant to the reasonableness of attorney's fees: "(1) The time and labor required, the novelty and difficulty of

the questions involved, and the skill requisite to perform the legal service properly; (2) The likelihood, if made known to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) The fee customarily charged in the locality for similar legal services; (4) The amount involved and the results obtained; (5) The time limitations imposed by the client or by the circumstances; (6) The nature and length of the professional relationship with the client; (7) The experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) Whether the fee is fixed or contingent."

The court has examined the contingency fee agreement between the plaintiffs and their attorney. It has also examined the affidavit submitted by their attorney regarding the hours spent pursuing this litigation and the hourly charges for those services. At the time this litigation was commenced the legal issues presented were those of a relatively straightforward collection action. The Hartmann defendants had not yet converted the secured property. The litigation became complex with multiple theories of liability being necessarily asserted to protect the interests of the clients. Further, the manipulation by Hartmann, Sr., of his corporate entities substantially increased the complexity of this litigation. A review of the pleadings in this file, as well as the supervision of the trial of this case leads the court to the conclusion that the hours put in by the plaintiffs' attorney were reasonable and necessary. The court finds that the hourly charge of $200 per hour is also reasonable for this commercial litigation. A further consideration is that the attorney for the Hartmann defendants submitted a claim for legal fees of $105,197.50 plus costs. These fees were calculated from hourly rates for attorneys ranging from $200 to $295 per hour. Finally, the court notes that the defendant Hartmann, Sr., threatened the plaintiffs that he would

make it expensive if the plaintiffs asserted their security interest in the kitchen equipment. The court finds that it would work a manifest injustice and be a cause of substantial unfairness to limit the plaintiffs' recovery of attorney's fees to the contingent fee contract. In addition to the previously determined damages, the court awards the plaintiffs punitive damages and/or legal fees in the amount of $39,640 for the period of August 10, 2004, through January 11, 2007.

The plaintiffs also claim but have not pleaded treble damages for statutory theft. Practice Book § 10-3 (a) sets forth the general principle that "[w]hen any claim made in a complaint . . . is grounded on a statute, the statute shall be specifically identified by its number."

General Statutes § 52-564 defines theft as follows: "Any person who steals any property of another, or knowingly receives and conceals stolen property, shall pay the owner treble his damages." General Statutes § 53a-118 (a) (5) defines an owner to mean "any person who has a right to possession superior to that of a taker, obtainer or withholder." "Statutory theft under § 52-564 is synonymous with larceny under General Statutes § 53a-119. . . . Pursuant to § 53a-119, [a] person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or [withholds] such property from an owner. . . . Conversion can be distinguished from statutory theft as established by § 53a-119 in two ways. First, statutory theft requires an intent to deprive another of his property; second, conversion requires the owner to be harmed by a defendant's conduct. Therefore, statutory theft requires a plaintiff to prove the additional element of intent over and above what he or she must demonstrate to prove conversion." (Internal quotation marks omitted.) *Deming* v. *Nationwide Mutual Ins. Co.*, supra, 279 Conn. 771. A higher burden of proof is also required; the plaintiff must prove

statutory theft pursuant to § 52-564 by clear and convincing evidence. See *Suarez-Negrete* v. *Trotta*, 47 Conn. App. 517, 520, 705 A.2d 215 (1998).

Had the plaintiffs properly pleaded a claim for statutory theft the court would have found the evidence clearly and convincingly established the elements to support such a claim. Given the posture of the pleadings, however, the court declines to consider this claim.

The defendant JRCLLC claimed that the plaintiffs wilfully and wantonly converted property or equipment covered by its security agreement with Seawind. There is no credible evidence to support such a theory of recovery. The plaintiffs merely sought to protect their superior security interest in the kitchen equipment.

The counterclaim also contains the allegation: "As a result of [the] plaintiffs' actions [the] plaintiffs have erroneously brought suit against [the] defendants [JRInc., JRCLLC, Hartmann, Sr., Hartmann, Jr., and Jason Hartmann, who] have been damaged by [the] plaintiffs' actions." As detailed in this decision, there is no merit in the claim.

E

Eighth Count—Conversion—*Tzovolos* v.
*JRInc.* and *Alpert*

The eighth count of the plaintiffs' complaint pleads an alternative theory of liability based upon the allegations contained in the companion case. In the companion case, JRInc. sued Alpert based upon Alpert's conduct in changing the locks on Selden Street on April 14, 2004. JRInc., through its attorney, Shepro, asserted that it had a security interest in the personal property at Selden Street and that its interests were injured by Alpert's conduct. The plaintiffs asserted that either Alpert or JRInc., was in control of Selden Street between April

14, 2004, and April 26, 2004, when some of the secured kitchen equipment disappeared.

There was no credible evidence that Alpert removed any kitchen equipment from the premises, and, therefore, a cause of action cannot stand against them. There was also no evidence that JRInc., had any interest in the premises because the security lien was actually in the name of JRCLLC. This is an instance when Hartmann, Sr., manipulated his corporate entities, confused himself and caused injuries to others. The evidence identified in the fourth count as to the other Hartmann defendants is equally applicable as to JRInc. Hartmann, Sr., utilized this entity for his own purposes and converted $12,700 of property securing the plaintiffs' debt.

F

Fifth Count—Fraudulent Conveyance—*Tzovolos* v. *Hartmann individual defendants* and *JRInc.* and *JRCLLC*

General Statutes § 52-552e provides in relevant part: "(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, if the creditor's claim arose before the transfer was made or the obligation was incurred and if the debtor made the transfer or incurred the obligation: (1) With actual intent to hinder, delay or defraud any creditor of the debtor . . . . (b) In determining actual intent under subdivision (1) of subsection (a) of this section, consideration may be given, among other factors, to whether: (1) The transfer or obligation was to an insider, (2) the debtor retained possession or control of the property transferred after the transfer, (3) the transfer or obligation was disclosed or concealed, (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit, (5) the transfer was of substantially all the debtor's assets, (6) the debtor absconded, (7) the debtor removed or concealed assets, (8) the value of the

consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred, (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred, (10) the transfer occurred shortly before or shortly after a substantial debt was incurred, and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor." General Statutes § 52-552f (b) provides that "[a] transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time and the insider had reasonable cause to believe that the debtor was insolvent."

The plaintiffs allege that, in violation of the Connecticut Uniform Fraudulent Transfer Act (act), General Statutes § 52-552a et seq., Hartmann, Sr., removed the three items of kitchen equipment on April 26, 2004, with the intent to hinder, delay or defraud the plaintiffs. In order for the court to find that the act is applicable it must determine whether Scawind was a debtor as that term is defined in the act. At the time the kitchen equipment was removed, Seawind was the possessor of the equipment and was aware of the plaintiffs' security interest in the equipment. It previously, through the conduct of its managers, Wiseman and Hartmann, Sr., had attempted to encumber the equipment with a security interest for the benefit of JRCLLC when it purportedly gave JRCLLC a security interest in the same. At the time the security interest was purportedly given by Seawind, Hartmann, Sr., was exercising dominion and control over Seawind as has previously been determined.

At two separate times, Hartmann, Sr., and entities he controlled acted in a fraudulent manner toward creditors. The plaintiffs' security interest in the kitchen

equipment was created in August of 2003. In January of 2004, the giving of a $100,000 promissory note and security was made to an insider, as JRCLLC was owned and controlled by the Hartmann family. Further, the debt was an antecedent debt. At the time of the transfer, Hartmann, Sr., knew Seawind was insolvent in that it was not paying its debts as they became due. In April of 2004, when Hartmann removed the three items of kitchen equipment from Selden Street, he knew that the transfer was to an insider, that the transfer was concealed from creditors, and that the plaintiffs had instituted litigation to recover the kitchen equipment. When Hartmann, Sr., his sons or his entities removed the kitchen equipment from Selden Street on April 26, 2004, Seawind was insolvent as defined by the General Statutes.

The court finds that Hartmann and sons acted with an actual intent to defraud the plaintiffs when they removed the three pieces of kitchen equipment from Selden Street in April of 2004. The plaintiffs have been damaged to the extent that they were unable to apply the value, previously determined to be $12,700, of the equipment toward their debt.

G

Sixth Count—CUTPA—*Tzovolos* v. *Hartmann individual defendants, JRInc. and JRCLLC*

In count six, the plaintiffs allege that the defendants' conduct amounted to a violation of CUTPA. "To establish a CUTPA violation, a claimant's evidence must establish that the conduct at issue falls within one of three criteria. A court must decide whether the conduct (1) offends public policy, (2) is immoral, unethical, oppressive or unscrupulous or (3) causes substantial injury to consumers, competitors or other businessmen." (Internal quotation marks omitted.) *Russell* v.

*Russell,* 91 Conn. App. 619, 646, 882 A.2d 98, cert. denied, 276 Conn. 924, 888 A.2d 92 (2005).

The defendants jointly and severally contest the imposition of CUTPA liability, asserting that the conduct complained of was not in their primary trade or business. They claim that their primary business related to construction or real estate development, not operation of a restaurant. In *McCann Real Equities Series XXII, LLC* v. *David McDermott Chevrolet, Inc.,* 93 Conn. App. 486, 890 A.2d 140, cert. denied, 277 Conn. 928, 895 A.2d 798 (2006), a case cited by the defendants, the court addressed whether a defendant car dealership could be held liable under CUTPA for its conduct relating to the sale of real property. The court held that "a CUTPA violation may not be alleged for activities that are incidental to an entity's primary trade or commerce." Id., 523. The defendant was engaged in a primary business of car service and sales, and the real estate transaction was incidental to this business. Id., 521.

The facts underlying the present case differ substantially from the situation set forth in *McCann Real Equities Series XXII, LLC.* The court notes that the individual defendants were each members of Seawind, the corporate entity that operated the restaurant. The court also finds that the corporate entities controlled by Hartmann and sons had significant experience in the renovation of restaurant properties. Furthermore, a part of most businesses' commerce is the borrowing or providing of capital, the giving or taking of security interests and dealing honestly and in a nonpreferential manner to creditors of an insolvent entity. These acts are within the primary scope of business and, therefore, are subject to CUTPA.

Here, Hartmann, Sr., his sons, and the entities that he controlled, dealt with creditors of Seawind and persons

holding security interest in equipment controlled by Seawind in an unscrupulous, oppressive and immoral manner. Hartmann, Sr., has compounded problems that existed in his original business deal with Wiseman by asserting claims that he knew were baseless, by inflating bills for services provided by one of his corporate entities to Seawind, and by threatening those such as Alpert and the plaintiffs when they asserted rights inconsistent with the stated positions of Hartmann, Sr. The evidence indicates that he also negotiated in bad faith to get access to Selden Street to remove the kitchen equipment and threatened to abuse the legal system so as to deter the plaintiffs from asserting their security rights in the kitchen equipment. This conduct satisfies the second criteria of a CUTPA violation.

The plaintiffs were harmed when Hartmann and sons knowingly removed equipment belonging to the plaintiffs in order to hinder the creditors of Seawind. Although they purportedly were acting as a representative of the various corporate entities, the evidence indicates that they used their control over the LLCs to perpetrate a wrong, which resulted in harm to the plaintiffs.

The conduct of Hartmann, Sr., as an investor and manager of Seawind falls within the ambit of CUTPA and is in violation of CUTPA. The plaintiffs were harmed by his conduct and are entitled to statutory relief. Pursuant to General Statutes § 42-110g (a) and (d), the court has discretion to award punitive damages and attorney's fees under CUTPA. See also *Gargano* v. *Heyman*, 203 Conn. 616, 622, 525 A.2d 1343 (1987). Therefore, in addition to this court's previous finding that attorney's fees are recoverable under count four, sounding in conversion, CUTPA provides an alternative statutory basis for such an award.

The violation of CUTPA damaged the plaintiffs in that the equipment that they looked to for security for

their debt was converted by the defendants. The value of the equipment was $12,700. In addition to these damages the court will award the plaintiffs the statutorily authorized attorney's fees. Section 42-110g (d) provides that the award of reasonable attorney's fees should be based on the work "reasonably performed by an attorney and not on the amount of recovery. . . ." The court will discuss and make an award of attorney's fees at the conclusion of this memorandum.

## H

### Ninth Count—Tortious Interference—*Tzovolos* v. *All Defendants*

The plaintiffs claim that each of the defendants interfered with their contractual relations with Wiseman and Seawind when the secured kitchen equipment was removed on April 26, 2004. "A claim for tortious interference with contractual relations requires the plaintiff to establish (1) the existence of a contractual or beneficial relationship, (2) the defendants' knowledge of that relationship, (3) the defendants' intent to interfere with the relationship, (4) the interference was tortious, and (5) a loss suffered by the plaintiff that was caused by the defendants' tortious conduct. . . . Unlike other torts in which liability gives rise to nominal damages even in the absence of proof of actual loss . . . it is an essential element of the tort of unlawful interference with business relations that the plaintiff suffers actual loss." (Citation omitted; internal quotation marks omitted.) *Appleton* v. *Board of Education*, 254 Conn. 205, 212–13, 757 A.2d 1059 (2000).

The plaintiffs have established that they had a contractual relationship with Seawind and Wiseman as evidenced by the contract for purchase and sale, the bill of sale, the promissory note and the UCC-1 filing. The evidence indicates that Hartmann, Sr., was aware of the plaintiffs' superior rights in the kitchen equipment.

The plaintiffs had provided documentary evidence to establish their superior right when the parties met in early March of 2004. At this time, the Hartmanns learned that the documentation previously provided by Wiseman was a forgery. It is clear that Hartmann, Sr., knew of the plaintiffs' interest in the equipment. Despite this knowledge, however, the plaintiffs established that Hartmann, Sr., and entities controlled by him interfered with the plaintiffs' exercise of their security rights in the three pieces of kitchen equipment. Additionally, the motivation of Hartmann, Sr., in removing the equipment was for the improper reasons of preferring one creditor of Seawind and Wiseman over another, and to delay or hinder the plaintiffs in their exercise of their contractual rights. Finally, the plaintiffs have established they were damaged by this conduct in that they were prevented from recovering possession and ownership of the three items of kitchen equipment valued at $12,700. The court finds that the plaintiffs have established, by a fair preponderance of the evidence, that the defendants represented by Shepro have tortiously interfered with their contractual relations.

The plaintiffs have not established by a fair preponderance of the evidence that the conduct of Alpert, while interfering with their immediate repossession of the kitchen equipment, acted with an improper motive or means. The court finds in favor of Alpert on this count.

I

Tenth Count—CUTPA as to *JRInc.* and *Alpert*

In light of the court's finding as to count six and seven, the court does not review this allegation as to JRInc. The court has previously determined that JRInc. had no separate identity from Hartmann, Sr., in this transaction. The court does not find that the plaintiffs have proven their case as to Alpert.

J

## Eleventh Count—Unjust Enrichment—*Tzovolos* v. *All Defendants*

The plaintiffs' evidence has not demonstrated that Alpert has been unjustly enriched in any manner with regard to these proceedings. They have acted in a commercially reasonable manner as a landlord over the successive tenancies of the plaintiffs, Chaouki and with Wiseman and Seawind.

Seawind has benefited from the transaction between the plaintiffs and Wiseman. During the short period of time that the restaurant at Selden Street was operating, the equipment in question was used by Seawind. The court notes that the payments on the promissory note were made by Seawind. Seawind, acting through Hartmann, Sr., acted to impair the security interest held by the plaintiffs. Further, utilizing the various corporate entities controlled by Hartmann, Sr., including Seawind, Seawind failed to continue to pay on the promissory note but retained possession of the equipment. In April of 2004, Seawind, through its manager Hartmann, Sr., asserted a continued right to possess the kitchen equipment and prevented the plaintiffs from exercising their security rights as to the three pieces of missing equipment.

In light of the conduct and motive of the Hartmann defendants it would be decidedly unjust and inequitable to allow the Hartmann defendants to be enriched to the detriment of the plaintiffs.

## K

## Count One—Damages—*JRInc.* v. *Alpert*

## Count One Counter Cross Claim—Misrepresentation— *JRCLLC* v. *Alpert*

In count one of the consolidated case, JRInc. asserts that it had been damaged when Alpert refused to give

it access to Selden Street to remove personal property subject to JRInc.'s alleged security interest. JRInc. alleged that it loaned money to Seawind and that that loan was secured by a lien on the kitchen equipment and other personal property located at Selden Street. It further alleges that when Seawind defaulted on the note, Alpert prevented it from recovering possession of all of the personal property that secured its loan to Seawind. JRInc. does not allege any particular theory of recovery to support its claim of damages.

The court finds JRInc.'s first count to be devoid of merit. The evidence indicates that on or about January 7, 2004, Seawind executed a $100,000 promissory note to JRCLLC. JRInc. does not have an interest in this note and cannot be damaged by Alpert's conduct. The court also notes that JRInc. sought to amend its complaint to bring the claim in the name of its sister corporate entity JRCLLC. The court denied the motion to amend. However, the complaint in this case was dated September 30, 2004. It was not until the last days of trial, after the plaintiffs had rested their case and the testimony of most of the witnesses in the case had been offered, that JRInc. sought to amend its complaint so as to substitute JRCLLC for itself.

JRCLLC, however, took advantage of the plaintiffs' filing of an amended complaint shortly before commencement of the trial and filed a counter cross claim against Alpert. The three count cross complaint closely paralleled the substance of JRInc.'s complaint. In the first count of the counter cross complaint, JRCLLC alleges that Alpert, prior to evicting Seawind, took possession of Selden Street and prevented JRCLLC from removing the personal property that was subject to a security interest held by JRCLLC. It alleges that it relied upon Alpert to keep third parties out of the premises and when Alpert allowed others to enter, JRCLLC was

damaged. The court will therefore address the parallel claims of JRCLLC.

The court has previously determined that Alpert was within its rights under the lease and acted with the express permission of one of the comanagers of Seawind in changing the locks on Selden Street. Alpert, upon securing an indemnification agreement from Shepro on behalf of his clients, allowed Hartmann and his controlled entities to recover personalty from Selden Street. Hartmann left the premises precipitously when the plaintiffs arrived in the afternoon of April 26, 2004. They were not asked to leave by Alpert. Hartmann did not again request to enter Selden Street until August of 2004. This second request was long after the time set in the eviction process. As previously noted, Shepro represented Seawind in the eviction process. JRCLLC has not established a factual or legal foundation that would support a claim of misrepresentation.

L

Count Two—Conversion—*JRInc.* v. *Alpert*

Count Two Counter Cross Claim—Conversion—
*JRCLLC* v. *Alpert*

Based upon the court's prior findings of fact, there is no proof that JRInc. had a right to any "secured property" on Selden Street. It therefore stands to reason that a cause of action for conversion of the "secured property" is without merit.

Likewise, JRCLLC's claim of conversion in count two of the counter cross claim is also without factual or legal foundation for reasons previously stated. Alpert allowed JRCLLC ample opportunity to remove the property in which it held a security interest on April 26, 2004. During the time it was on the premises, it and its principal, Hartmann, Sr., exceeded the terms of their

agreement and removed personalty in which the plaintiffs had a superior right. JRCLLC made no other timely effort to obtain additional personalty that may have been left on the premises.

## M

### Count Three—Intentional Misconduct— *JRInc.* v. *Alpert*

### Count Three Counter Cross Claim—Intentional Misconduct—*JRCLLC* v. *Alpert*

Based upon the court's prior findings of fact, there is no proof that JRInc. had a right to any "secured property" on Selden Street.

JRCLLC has also failed to provide any evidence of wilful or wanton conduct on the part of Alpert. Alpert was within its rights and, in the court's opinion, acted to protect the alleged competing security interests in the kitchen equipment and other personalty located in Selden Street.

## N

### Cross Complaint Count One—Indemnity—*Alpert* v. *Hartmann, Sr., Hartmann, Jr., Jason R. Hartmann* and *JRCLLC*

Alpert alleges that it entered into an indemnification agreement with the Hartmann defendants in April of 2004. After Alpert secured Selden Street on April 14, 2004, Shepro negotiated with Alpert's attorney to determine a time when the defendants could retrieve "their" personal property left at Selden Street. In return for Alpert allowing the defendants access to Selden Street on April 26, 2004, the defendants agreed to hold Alpert harmless. On April 16, 2004, Shepro wrote Alpert's attorney and stated: "Per our conversation, Jason Roberts will take only what it has a lien on and will hold your

client harmless from claims of others that it took property of others, provided it gets immediate access. Jason Roberts will not be responsible for property taken by others." This letter is another instance where Hartmann's attorney is not specific as to the entity offering the indemnification agreement. It is part of a pattern of casualness by Hartmann and his attorneys toward the various corporate entities controlled by the Hartmanns and the individuals represented by Shepro.

Connecticut law recognizes two types of indemnity agreements, those that indemnify against loss and those that indemnify against potential liability. See, e.g., *Amoco Oil Co.* v. *Liberty Auto & Electric Co.*, 262 Conn. 142, 149, 810 A.2d 259 (2002). "In giving meaning to the terms of a contract, we have said that a contract must be construed to effectuate the intent of the contracting parties. . . . In ascertaining intent, we consider not only the language used in the contract but also the circumstances surrounding the making of the contract, the motives of the parties and the purposes which they sought to accomplish." (Citations omitted; internal quotation marks omitted.) *Barnard* v. *Barnard*, 214 Conn. 99, 109–10, 570 A.2d 690 (1990).

By the clear language of this indemnity agreement, "Jason Roberts" intended to indemnify Alpert for claims that arise if the wrong property was removed and this is precisely what has occurred in the present case. The plaintiffs have asserted a superior right to equipment removed by the defendants, and have raised claims against the parties who removed the property as well as Alpert.

Additionally, the court also notes that this letter must be understood in its context. The day prior to the writing of the letter, Alpert, the plaintiffs and Shepro, on behalf of his clients, had informed each other of the competing liens and had exchanged copies of the documentation

supporting the claims. It was clear that the plaintiffs' lien was prior in right as to the kitchen equipment, and further, that JRCLLC had been given a broader lien that covered both the kitchen equipment and other personal property located at Selden Street. Thus at the time that the letter was written, the defendants were fully aware that certain equipment was subject to competing security interests, but still sought access to the premises to remove equipment and furnishings. With knowledge of the competing interests, they agreed to indemnify Alpert for any claims arising from the removal of the wrong equipment. The plaintiffs limited their claims solely to the kitchen equipment and did not object to Hartmann, Sr., removing other personalty.

In reliance on Shepro's letter, the authority of which was initially contested but ultimately confirmed at trial through the testimony of Hartmann, Sr., Alpert allowed Hartmann, Sr., access to Selden Street. Then, not only did Hartmann, Sr., violate the terms of the agreement by removing the items of kitchen equipment covered by the plaintiffs' lien, but Alpert has been caused to defend the action filed by the plaintiffs, the counter cross claim filed by JRCLLC, and the action filed by JRInc. Alpert has been damaged in that it incurred attorney's fees in the amount of $28,395.

The court has also examined the affidavit of attorney's fees submitted on behalf of Alpert. The fees were incurred between September 1, 2004, through January 11, 2007. Applying the same standards as used for the plaintiffs' request for legal fees, the court finds that the hours spent by Alpert's counsel and the hourly fee of Alpert's counsel to be reasonable and/or necessary. Although the court has not awarded any damages to the plaintiffs on their claims against Alpert the court does not believe it is appropriate to enter an award against the plaintiffs. Based upon the indemnification agreement, the court awards Alpert against Hartmann,

Sr., Jason R. Hartmann, Hartmann, Jr., JRInc., and JRCLLC, legal fees in the amount of $28,395.

## VI

## SUMMARY OF ORDERS

The court holds that the plaintiffs have established their entitlement to recovery under several theories of liability. The damages under each theory involved the conversion of the items of kitchen equipment in which they held a security interest. This equipment had a value of $12,700. Further the plaintiffs have established that Hartmann, Sr., Jason R. Hartmann and Hartmann, Jr., exercised dominion and control over the businesses of Seawind, JRInc., and JRCLLC. The individual defendants Hartmann, Sr., Hartmann, Jr., and Jason R. Hartmann acted individually and through their agents or servants in carrying out the events complained of in this complaint.

Although the court has determined the appropriate damages under each theory of liability the total judgment against Hartmann, Sr., Jason R. Hartmann, Hartmann, Jr., Seawind, JRInc., and JRCLLC to the plaintiffs is jointly and severally $12,700, plus statutory interest from April 26, 2004.

The court has also determined that the plaintiffs are entitled to punitive damages at common law and a statutory award of attorney's fees as to the CUTPA count against Hartmann, Sr., Jason R. Hartmann, Hartmann, Jr., JRCLLC and JRInc. in the amount of $39,640.

Alpert is entitled to an award of attorney's fees from Hartmann, Sr., Jason R. Hartmann, Hartmann, Jr., JRInc. and JRCLLC on account of the indemnification agreement.

Finally, the court awards costs to the plaintiffs against the Hartmann defendants, and it also awards

costs to Alpert on their cross claim against the Hart-
mann defendants.